**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  09-21030-CR-UNGARO/SIMONTON**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**LUIS MANUEL MORANTE-PALACIOS,**

      **Defendant.**

_____/

**REPORT AND RECOMMENDATIONS**

      Presently pending before this Court is Defendant Morante-Palacios' Motion to Suppress Evidence and All Post-Arrest Statements (DE # 33).  This motion was referred to the undersigned Magistrate Judge by the Honorable Ursula Ungaro, United States District Judge (DE # 34).  The Government has responded in opposition (DE # 36).  An evidentiary hearing was held on February 24, 2010.   For the reasons set forth below, the undersigned recommends that the Motion be DENIED.

      I.     **BACKGROUND**

      Defendant Luis Morante-Palacios (hereafter "the Defendant" or "Defendant Morante-Palacios"), is charged in four counts of a five-count Indictment with the following offenses: Conspiring between November 20, 2009 and December 1, 2009, with co-defendant Brian Williams and others, to import at least 500 grams of cocaine into the United States, in violation of 21 U.S.C. § 963 (Count 1); Conspiring with co-defendant Brian Williams and others to possess with intent to distribute at least 500 grams of cocaine, between November 20, 2009 and December 1, 2009, in violation of 21 U.S.C. § 846 (Count 2); Importation of at least 500 grams of cocaine into the United States, on December 1, 2009, in violation of 21 U.S.C. § 952(a) and 18 U.S.C. § 2 (Count 3);

Attempted possession with intent to distribute at least 500 grams of cocaine on December 1, 2009, in violation of 21 U.S.C. § 846 (Count 5).

The events which form the basis for these charges began after the arrival of co-defendant Brian Williams at Miami International Airport on December 1, 2009, from Lima, Peru.  Co-defendant Williams was carrying luggage which contained approximately 10.63 pounds of cocaine.  The government alleges that co-defendant Williams agreed to cooperate and make a controlled delivery of the cocaine to its intended recipient.  As a result of this attempt, Defendant Morante-Palacios was arrested outside the Miami International Airport and charged with the above offenses.  Following his arrest, federal law enforcement agents seized three cellular telephones which were in his possession, and obtained various information from those telephones.  In addition, the Defendant made various post-arrest statements.

In the presently pending motion, for the reasons discussed below, Defendant Morante-Palacios seeks to suppress all evidence which was seized from him at the time of his arrest and all statements he made following his arrest.

## II.    THE MOTION TO SUPPRESS

Defendant Morante-Palacios initially contends that the agents did not have probable cause to arrest him, as required by the Fourth Amendment to the United States Constitution, and therefore all evidence and statements which were obtained following this arrest must be suppressed.  Specifically, he seeks to suppress all cell phones, and cell phone information seized by the government, "including, but not limited to records of cell phone calls made and received, names in the cell phone directories, text messages, and any other electronic data derived from the seizure of the cell phones" (DE # 33 at 3).  He also seeks to suppress subscriber information on the telephones and

records regarding the cell phones which were obtained as a result of subpoenas issued to the telephone carriers since none of this information would have been obtained absent his illegal arrest (DE # 33 at 3-4).  Finally, he contends that any statements he made were also the fruit of his illegal arrest, and should be suppressed (DE # 33 at 3-4).

In addition, Defendant Morante-Palacios contends that, even if his arrest was lawful, his post-arrest statements should be suppressed on the grounds that the circumstances under which the statements were made violated his Fifth and Sixth Amendment rights, and the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Specifically, he contends that after he was advised of his constitutional rights, he told the agents that he did not want to make a statement or communicate with them in any way, and he refused to sign a waiver of rights form (DE # 33 at 6).  The Defendant contends that thereafter, the agents continued to threaten and harass him regarding, *inter alia*, how much jail time he was facing, and that he finally agreed to speak to the agents only after five hours of continual harassment (DE # 33 at 6).  Thus, he contends that his statements must be suppressed since they were involuntarily made, and were taken in violation of the requirements of *Miranda v. Arizona* (DE # 33 at 7).

In response, the Government asserts that the arrest was based on probable cause based upon the information provided by co-defendant Williams following the discovery of cocaine in his suitcase, and the corroborating actions of Defendant Morante-Palacios prior to his arrest.  Therefore, the Government contends that there was no violation of the Defendant's constitutional rights under the Fourth Amendment, and that no evidence should be suppressed.

With respect to the Defendant's post-arrest statements, the Government asserts that when the Defendant was initially advised of his *Miranda* rights, was asked to initial

the statement of rights to acknowledge that he had been advised of these rights, and was asked whether he wanted to waive these rights, the Defendant was totally non-responsive–he "simply stared into space without even acknowledging the agents' presence" (DE # 36 at 6).  The Government contends that several hours later, the Defendant overheard one agent comment to another agent regarding "a typical drug dealer carrying three phones," and ten minutes later the Defendant spontaneously initiated conversation with the agents.  At that point, the agents re-advised the Defendant of his *Miranda* rights, he signed a waiver of rights form, and he made the statements which are the subject of this Motion to Suppress.  The Government contends that Defendant Morante-Palacios never unambiguously invoked his right to remain silent, and therefore the agents were not required to cease questioning him.  In the alternative, the Government contends that when the Defendant was non-responsive, all questioning ceased for a sufficient period of time to demonstrate that his right to cut-off questioning had been "scrupulously honored" (DE # 36 at 15).  Moreover, the Government argues that the Defendant initiated the further conversation, and that the agent's comment regarding the fact the Defendant was carrying three cellular telephones was not the functional equivalent of interrogation (DE # 36 at 15).  Finally, the Government asserts that the waiver of rights, and the statements made thereafter, were voluntary, and were not the result of coercion (DE # 36 at 15-16).

      IV.    **<u>FINDINGS OF FACT</u>**

At the evidentiary hearing, the Government presented the testimony of Immigration and Customs Enforcement ("ICE") Special Agent Carlos Ruiz and Special Agent Victor Lopez.  In addition, the Government introduced into evidence a CD containing two consensually monitored recorded conversations between the

cooperating co-defendant, Brian Williams, and the Defendant (GX 1); and, the two Advice of Rights forms used to advise the Defendant of his constitutional rights following his arrest (GX 2, GX 3).  The Defendant presented his case through the cross-examination of the agents, and introduced into evidence two sketches depicting, respectively, the area of the airport where the Defendant was first observed (DX 1), and the office where he was taken following his arrest (DX 2), which were drawn by Special Agent Ruiz during his cross-examination.  The testimony of the witnesses was credible, and was not disputed.  The Defendant agreed that the agents were credible witnesses; the dispute centers on the inferences drawn from these events, and the legal conclusions which flow from these facts.

On December 1, 2009, at approximately 6:00 a.m., co-defendant Brian Williams arrived at Miami International Airport from Lima, Peru.  An inspection of his luggage revealed that cocaine was secreted inside the lining of his luggage.  His itinerary reflected that he had traveled from Washington, D.C. to Toronto, Canada, to Lima, Peru; then he traveled from Lima, Peru to Miami, Florida; and, then he had a return flight to South America from Miami, Florida to Bogota, Colombia.  After discovery of the cocaine, Special Agent Carlos Ruiz went to the area where co-defendant Williams was being detained.  He arrived at approximately 8:00 a.m., and became the lead agent in the ensuing investigation.

Co-defendant Williams was questioned after the cocaine was discovered and he stated that he knew he was carrying drugs into the United States, that he had traveled to Peru and was given the suitcase.  He was told to fly back to the United States with the suitcase. He had been given a piece of paper with a telephone number and the name "Joe" written on it.  He was told to make contact with that person by calling the number

5

when he arrived in Miami.  Under the supervision of the agents, co-defendant Williams called the telephone number.  This conversation was recorded, and the CD containing the recorded call was introduced into evidence at the suppression hearing as GX 1.  The call is answered by "Joe," and there is a brief conversation in which "Joe" asked where the caller was, and whether he had exited or left the airport.  Williams tells "Joe" that the lines were long, and that he had not yet exited.  "Joe" stated that he would wait, that he was at the gate, and that the caller would see him when he left the gate.  "Joe" told the caller to call again "exactly" when he crossed the exit.

At approximately 8:30 a.m., co-defendant Williams placed another call to "Joe," which was also recorded.  During this brief conversation, "Joe" asked where the caller was, and Williams responded that he was still inside.  "Joe" told Williams that when Williams passed through the gate to leave, Williams would be on the third floor, and that he was on the third floor also, and would not leave.  "Joe" told Williams to call before he left the airport, and that he would tell Williams what to do.

Both of these conversations were in English, and "Joe" spoke fluent English with a Hispanic accent.  "Joe" never referred to Williams by name.

Co-defendant Williams then proceeded to leave the Customs enclosure on the third floor of Miami International Airport, carrying all of his personal belongings, which consisted of  the roller bag suitcase containing the cocaine, a backpack, and a skateboard.  Special Agent Ruiz followed Williams, remaining about 30 feet behind Williams.  Other agents were located in the general vicinity.  Agent Ruiz saw one individual, later identified as Defendant Morante-Palacios, standing near the exit from the Customs Enclosure in the waiting lobby.  Other than the Defendant, the lobby was nearly empty since there were no other flights arriving at that time, although a few

6

people were located in an area away from the doors to the Customs Enclosure.   When Williams entered the waiting lobby and walked toward the escalator, the Defendant followed Williams and caught up to Williams on the escalator.  The escalator was approximately 20 to 25 yards away from the waiting area.  The Defendant stood on the step immediately behind Williams.  When they arrived on the second floor, Williams and the Defendant parted ways.  Williams went in one direction to go to a store to obtain change so that he could use a pay phone to call "Joe", and the Defendant went in a different direction.  A member of the surveillance team advised the other members to watch the Defendant.  There is no evidence, however, that this was done.

After co-defendant Williams received change, he went to a pay phone and placed a call to "Joe".  Nobody saw whether the Defendant answered his cell phone when Williams placed this call.  Agent Ruiz then approached Williams and asked him what "Joe" had said.  Williams responded, "the exit, the exit."  Williams then walked outside the airport and walked down the sidewalk, followed by Agent Ruiz.  The Defendant then walked past Agent Ruiz, moving quickly until he reached Williams.  When he reached Williams, the Defendant slowed down and walked next to him.  The Defendant appeared to speak to Williams.  At that time, the Defendant and Williams were both taken into custody.  The time was approximately 8:45 a.m.  In making the arrest, the agents drew their weapons and told the Defendant to get down on the ground, but he did not comply. Therefore, the agents put him face down on the sidewalk and handcuffed him.  Agent Ruiz then placed a call to the phone number which Williams had used to contact "Joe," and a phone in the possession of the Defendant rang.

The Defendant and co-defendant Williams were taken to the U.S. Customs Office at Terminal J of the airport.  The Customs Office is an enclosed area that is

approximately 20 ft by 20 ft. in size, as depicted roughly in DX 2.  It contains an open space with two small offices located diagonally across from each other in corners of the space.  The open space has a bench as well as a desk.  Williams was taken into one of the small offices for further questioning, and so that he would be physically separated from the Defendant.  The Defendant was handcuffed to a bench that was located against one of the walls.

The Defendant had some dirt on his face and a scratch on his head from when he was arrested.  In the presence of Special Agent Ruiz, Special Agent Victor Lopez got a wet paper towel and cleaned this cut.  Agent Lopez asked the Defendant if he wanted anything to drink, any water, or anything to eat, or if he needed to use the bathroom.  The Defendant did not respond.[1]  Agent Lopez then asked the Defendant to acknowledge that he was asking if the Defendant needed anything.  The Defendant then gave a negative non-verbal response either by shaking his head "no" or by shrugging his shoulders.

Agent Ruiz advised the Defendant that he was in serious trouble and that it would be in his best interests to help himself out and speak to them.  The Defendant said nothing in response.  Agent Ruiz advised the Defendant of his Miranda rights, in English, by reading the standard Advice of Rights form (GX 2).  Agent Ruiz used English because he had heard the Defendant speak in fluent English during his conversations with Williams.  Agent Ruiz first advised the Defendant that he was going to advise him of his

---

[1]  Agent Ruiz testified that he believed that he saw the Defendant being permitted to leave the bench to use the restroom at some point; Agent Lopez testified that the Defendant never requested to use the restroom, although it was offered to him.  Since Agent Lopez appeared to be more certain than Agent Ruiz, the undersigned finds that the Defendant never asked to use the restroom before he was ultimately questioned.

rights, and then he read each line of the Miranda rights, line by line.[2]  Agent Ruiz then asked the Defendant if he would like to speak to them.  Agent Ruiz did not ask the Defendant if he understood his rights.  The Defendant did not acknowledge Agent Ruiz in any way.  Agent Lopez then asked the Defendant in Spanish if he had understood what had previously been said in English.  Again, the Defendant made no response at all.

---

[2]  The adequacy of the Statement of Rights form is not challenged.  It says:

> Before we ask you any questions, it is my duty to advise you of your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court, or other proceedings.
>
> You have the right to consult an attorney before making any statement or answering any questions.
>
> You have the right to have an attorney present with you during questioning.
>
> If you cannot afford an attorney, one will be appointed for you before questioning, if you wish.
>
> If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

Following the "Statement of Rights" section of the form, there is a "Waiver" section which states:

> I have had the above statement of my rights read and explained to me and I fully understand these rights.  I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity.  I was taken into custody at <u>8:45</u> (time), on <u>12/1/09</u> (date), and have signed this document at ___ (time),, on _____ (date).

There is then a place for a Defendant's signature, as well as the signatures of two witnesses.  Agents Ruiz and Lopez signed as witnesses.

9

Agent Ruiz wrote on the form, "Refused to sign."  Agent Lopez then stayed in the large room and began completing the paperwork to process the defendants and take them to the Federal Detention Center.  Agent Lopez asked the Defendant his first and last name, and the Defendant again made no response.  A few times later, the agents asked the Defendant if he wanted something to drink or doughnuts, or to use the restroom, and the Defendant did not respond.

Agent Ruiz left the Defendant, and went to interview co-defendant Williams. Williams advised Agent Ruiz that when the Defendant approached him on the escalator, the Defendant asked if Williams was a friend of Chad's, and Williams responded that he was.  Later, when they were on the sidewalk outside the airport, the Defendant approached Williams and, immediately before the arrest, stated, "This is what I want you to do."[3]

Agent Ruiz began completing the paperwork to process the Defendant within an hour after he was taken into custody.  At that time, he noticed that the Defendant's immigrant classification was based on the fact that he was the spouse of a Cuban resident.  Based upon his prior experience as an Adjudications Officer for the Immigration Service, Agent Ruiz conducted further investigation into the records, and became suspicious of the validity of the marriage.  Agent Ruiz then said aloud to other agents in the room, within the hearing of the Defendant, that it looks like the Defendant

---

[3]  The Government argued that these statements could be used to establish probable cause for the arrest since co-defendant Williams was acting as a confidential informant at the time, and, therefore, should be considered a government agent; thus his knowledge of events at the time should be considered part of the "collective knowledge" of law enforcement agents which could be relied upon to establish probable cause.  The Government was unable to cite any caselaw to support this proposition.  Based upon the conclusion set forth below that there was probable cause to support the arrest absent these statements, it is unnecessary to address the government's argument.

had a fake marriage.  This was said in the context of another possible criminal charge, and that the wife could be arrested for this as well.  The Defendant made no response. Approximately two or three times during the course of time that the Defendant was in custody in the Customs Office, Agent Ruiz walked into the room and made comments to him to the effect that it would be very beneficial to him to help himself out by talking to them, letting them know what was going on, letting them know what his role was, and that if he had something to say, this was his time to say it.  The last time that this comment was made was approximately 12:00 noon.

While Agent Lopez was sitting at the desk in the large space, one of the cellphones rang repeatedly.  At one point, approximately 1:30 p.m., Agent Lopez picked up the cellphone and saw the name "Peluca" on it.  Agent Lopez told the Defendant, "Gee, this guy is really trying to get a hold of you.  Who's trying to get a hold of you?" The Defendant made no response.  Agent Lopez put the phone down, and noticed that there were two other phones on the desk.  Agent Lopez then asked another agent, Eddie Nuevo, who owned the other phones.  Agent Nuevo responded by looking at the Defendant.  Agent Lopez then replied, "Well, he's walking around with three phones like a typical drug dealer."

Approximately ten or fifteen minutes later, the Defendant said, "Sir, may I ask you something, may I say something?"  Agent Lopez told the Defendant to go ahead and say what he had to say.  The Defendant responded that he was scared.  Agent Lopez thought that the Defendant was afraid of retaliation against himself or his family, and asked him what scared him.  The Defendant said he was thinking about what Agent Lopez said about having three phones and looking like a drug dealer.

Agent Ruiz overhead the Defendant say he was scared, and heard the Defendant

11

and Agent Lopez start to talk.  At that point, Agent Ruiz went over to them and interrupted them, saying that they needed to advise the Defendant of his Miranda rights. The agents began to advise him of his rights in English, but the Defendant said he had a hard time understanding the sentences.  They asked the Defendant if he felt more comfortable in Spanish, and he said he did.  Therefore, they advised him of his rights in Spanish.  The rights were read line by line, and the Defendant was advised that if there was something he did not understand, he should stop them, and they would explain it to him.  The Defendant placed his initials next to each right to acknowledge that he understood it, and signed the written waiver section at the bottom of the form at 2:15 p.m. (GX 3).  The Defendant never indicated that he did not understand, and never said that he wanted to stop the interview, never said that did not want to be asked questions, and never said that he wanted to speak to a lawyer.  The interview lasted approximately 30 minutes.[4]

---

[4]  Although the Government did not adduce evidence regarding the contents of the statements made by Defendant Morante-Palacios, the response to the Motion to Suppress contained the following summary of those statements (DE # 36 at 7-8):

> Morante told ICE Agents that a friend in Peru, whose name he did not provide initially, had asked him to pick up someone at the airport for him. Because Morante's cellular telephone had been ringing constantly since his arrest with the name "Peluca" appearing as the caller, the agents asked Morante if the friend was "Peluca" and Morante agreed.  Eventually, Morante provided Peluca's name as "Carlos Caballero."  Morante said that he and Peluca had grown up together in Peru, that he knew him well, that he was doing well for himself financially, but that he did not know what Peluca did for a living.  Morante said that Peluca asked him to buy a cellular telephone for this guy he would be picking up at the airport. Morante also said that Peluca had described the friend as a black male traveling with a skateboard, and that Peluca told him the friend would arrive at 6:00 a.m.  When the agents asked him what he was supposed to do with this guy, Morante said that he was supposed to help him get a cab and then go with him to a hotel.  When asked what hotel they would be going to, Morante said that he did not know; that the person he was

12

During the time the Defendant was in the Customs office, there were a total of approximately seven agents present throughout the office.  Some were in the small offices, and others were in main space.  The agents walked in and out of the space where the Defendant was detained.  There were never any guns drawn, and there were no threats or promises made to the Defendant.

V.      **LEGAL ANALYSIS AND CONCLUSIONS OF LAW**

A.      **The Determination of Probable Cause**

1.  **Framework for Analysis**

It is well-settled that to be constitutionally valid, an arrest must be supported by probable cause to believe that the suspect has committed an offense; *i.e.* at the time the defendant was arrested by the agents the "facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant]  had committed or was committing an  offense."  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  In *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983), the United States Supreme Court held that a determination of probable cause must be based an evaluation of the totality of the circumstances, and set forth the following guidance:

> Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a "practical, nontechnical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the

---

picking up would know.  Morante acknowledged that this story did not make sense, but said that's what it involved.  The agents asked Morante about his encounter with Williams on the escalator at the airport, and he said he asked Williams if he was a friend of Peluca's.  Morante showed the agents a picture of Williams he received from Peluca as an attachment to an e-mail.

factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Id., at 175.  Our observation in *United States v. Cortez*, 449 U.S. 411, 418 (1981), regarding "particularized suspicion," is also applicable to the probable cause standard:

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

> As these comments illustrate, probable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules.

In deciding whether there is probable cause to arrest, the court may examine the collective knowledge of law enforcement officers involved in the investigation.  *United States v.  Acosta*, 363 F.3d 1141, 1145 (11th Cir.  2004) (collective knowledge of the officers is relevant to probable cause inquiry); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir.  1985) (same).  Finally, the determination of probable cause is an objective determination, made without regard to the subjective beliefs of the officers.  *Whren v. United States*, 517 U.S. 806, 813 (1996); *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997).

Although mere presence in the vicinity of drug trafficking activity does not by itself establish probable cause to believe that the individual is a participant in that activity, when coupled with other facts and circumstances, the totality of those circumstances may rise to that level.  Numerous cases have considered whether there is

14

probable cause to believe that an individual present at the location where unlawful activity is occurring was involved in that activity.  For example, in *United States v. Irurzun*, 631 F.2d 60 (5th Cir. 1980), the Eleventh Circuit Court of Appeals' predecessor Court held that there was probable cause to support the arrest of defendant Irurzun, who had been present inside a closed restaurant when a drug trafficker spoke over the telephone to a confidential informant about a drug transaction that was supposed to occur at the restaurant at that time.[5]  The drug trafficker told the informant that "my people are here," and the only people inside the restaurant were Irurzun and co-conspirator Garces.  Both Irurzun and Garces then left the restaurant.  Later that evening, Garces showed the undercover agent and the informant cocaine, at which time the owner of the restaurant and Garces asked to see the money.  The informant left the restaurant, ostensibly to arrange for the production of the money, and Garces also left. Garces was observed walking a short distance where he spoke to Irurzun and another individual who drove up in a car.  Following this conversation, Garces returned to the restaurant, and Irurzun and the other individual drove to the nearby Pentagon Motel parking lot, where they waited.  Garces retrieved the cocaine from the restaurant and left, stating that if the money was produced they could come to his apartment.  When Garces left the restaurant, he was arrested and told the agents he was taking the cocaine to the Pentagon Motel, where he lived.  As Garces was being driven away from the scene, Irurzun saw him in the police car, and rapidly walked away from the area. Although Irurzun had not been involved in any of the incriminating conversations, and

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

had not been present during any of the meetings with the informant or undercover agent, the Court held that the actions of Irurzun during the course of those negotiations, when combined with his presence in the area, established probable cause to believe that he was a part of the conspiracy to distribute the cocaine.

Other cases have similarly held that conduct innocent in and of itself, when combined with presence in the vicinity of criminal activity, established probable cause to support an arrest for that activity. In *Whitaker v. Estelle*, 509 F.2d 194 (5th Cir. 1975), the former Fifth Circuit examined this issue in the context of circumstances analogous to those in the case at bar, *i.e.*, where the defendant's appearance at a time and place where the criminal activity was supposed to occur gave rise to probable cause. There, the defendant was arrested for the rape of a waitress. The waitress provided only a general description of the suspect with the information that he had been wearing a long brown coat. She also told police that, out of fear for her life and a desire to trap her attacker, she had agreed to see him again, and had arranged to meet him outside the restaurant where she worked two evenings later. When a man wearing a three-quarter length brown coat, who matched the general description of the perpetrator, arrived at the restaurant at the designated time, the police arrested him. In determining that the police had probable cause for this arrest, the court stated:

> We conclude there was probable cause for the arrest. First, based on information supplied by the victim, the police were aware of a time and location where there was a substantial possibility that the victim's attackers might appear. Indeed, it was because of this information that they were able to place themselves in a position to apprehend Whitaker. Secondly, from the same source they also possessed a general physical description of the assailants and knowledge that the second man, who had asked the victim if she wished to see him again, had been wearing a 'long brown coat.' When Whitaker arrived, Detective Jones saw that he not only fit the physical description furnished by the victim but was clad in a three-quarter

16

> length brown coat.  Finally, these facts were corroborated by the officer's personal observation of Whitaker walking back and forth in the area for several minutes in such a way as to keep the restaurant and the victim's car in view.  The totality of these circumstances was sufficient in our view to give Detective Jones reasonable cause to believe that a felony had been committed and that Whitaker was one of its perpetrators.

509 F.2d at 196.

Likewise, in *United States v. Smith*, 308 F.2d 657, 662-63 (2nd Cir. 1962), in upholding the arrest of a drug trafficking suspect, the Second Circuit emphasized the significance of the fact that a suspect showed up at the time and place designated for criminal activity:  "Finally, Thompson set up a rendevous between his source of supply and agent Robinson at 131st Street and Seventh Avenue.  Appellant turned up at the appointed place at the appointed time.  This fact alone is an important factor in determining probable cause."  *Accord United States v. Fairfield*, 526 F.2d 8 (8th Cir. 1975) (probable cause to arrest defendants who were only persons in parking lot in immediate vicinity of empty, locked car that matched description of stolen car, and which police had seen enter the parking lot a few minutes earlier, where reliable informant stated that stolen car would be brought to that location in Missouri by resident of Illinois, and police learned that defendants were from Illinois).

## 2.  There Was Probable Cause to Arrest the Defendant

In the case at bar, the undersigned concludes that there was probable cause to believe that Defendant Morante-Palacios was involved in the conspiracy to possess with intent to distribute cocaine at the time he was arrested.  His presence and actions with respect to meeting co-defendant Williams were similar to the actions of the defendant in *Irurzun, supra.*, since, although those actions were innocent in and of themselves, the circumstances of the meetings with a known drug courier (Williams) were such that

17

there was probable cause to believe that he was a part of the drug conspiracy. Specifically, the agents in the case at bar knew that co-conspirator Williams had been given a name and telephone number to call when he arrived with the cocaine.  He called the number and had two telephone conversations with this individual, "Joe," who told Williams that he was waiting outside the Customs Enclosure on the third floor of the airport.  The conversations were consistent with Williams' statement that "Joe" would tell him where to take the cocaine, and inconsistent with an innocent individual who was waiting to meet someone at the airport.  When Williams left the Customs Enclosure, the Defendant was the only person waiting in the vicinity of the doors leading from the Customs Enclosure to the waiting lobby, which is where "Joe" said he would be waiting. Williams was followed closely by the Defendant as he took the escalator to the second floor.  After Williams made another phone call to "Joe," Williams advised the agents that "Joe" had told him to go to the exit.  When Williams began walking down the sidewalk outside the airport, Defendant Morante-Palacios again walked rapidly, past Agent Ruiz, to catch up to Williams, and began speaking to him.  At that point, the totality of the circumstances established probable cause to believe that Morante-Palacios was "Joe" and that he was meeting Williams to assist in the distribution of the cocaine which Williams had brought with him from Peru.  Therefore, the arrest of Defendant Morante-Palacios was lawful, and the fruits of this arrest should not be suppressed.

    **B.**    **The Waiver of Miranda Rights and the Voluntariness of the Defendant's Statements**

       **1.**    **Framework for Analysis**

The Government has the burden to prove by a preponderance of the evidence that the defendant was properly advised of his rights, as required by *Miranda v. Arizona*, 384

U.S. 436 (1966), and that he made a knowing, voluntary and intelligent waiver of those rights, and that any subsequent statements were voluntarily made. *United States v. Chirinos*, 112 F.3d 1089, 1102 (11th Cir. 1997); *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir. 1994).

The Supreme Court has established that there are two components to a valid waiver: (1) the waiver must be voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception," and (2) the defendant must be aware "of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). In assessing the validity of a waiver, the totality of the circumstances surrounding the questioning must be examined, including such factors as the defendant's intelligence and education, the defendant's age, the defendant's familiarity with the criminal justice system, the defendant's physical and mental condition, the explicitness of the waiver, any language barriers, and the time lapse between the advice of rights and the actual questioning. A waiver is valid and voluntary if, under the totality of the circumstances, the will of the accused was not overborne by pressure attending the circumstances, but rather the statement is a product of the accused's free and rational choice. *Leon v. Wainwright*, 734 F.2d 770, 772 (11th Cir. 1984).

Even where a waiver is valid, however, a confession can still be involuntary under certain circumstances, for example, based on circumstances that occur after the waiver. *See, e.g. United States v. Rutledge*, 900 F.2d 1127, 1128 (7th Cir.1990). In determining voluntariness of a confession, the test is similar to the test for determining the voluntariness of a waiver of rights. The key focus is whether there was police overreaching such that the will of the defendant was overborne by intimidation, coercion

or threats.  *See e.g., Colorado v. Connelly*, 479 U.S. 157, 166-67 (1986) (to establish a confession is involuntary, the defendant must establish police coercion); *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11ᵗʰ Cir. 1996); *Moore v. Dugger*, 856 F.2d 129, 132 (11ᵗʰ Cir. 1988) (mental deficiencies, in the absence of police coercion, are not sufficient to establish involuntariness; and, fact that defendant was generally calm and responsive during interrogation, that he did not appear confused and that he understood the questions put to him established an valid waiver of *Miranda* rights, despite low IQ of defendant).

In numerous cases, the Eleventh Circuit has considered whether statements made by law enforcement officers to defendants concerning the effects of a decision to cooperate constitute unlawful coercion which renders a waiver of rights and/or a confession involuntary.  Where the statements by law enforcement officials undermine or nullify the advice of rights, the confession and/or waiver of rights has been ruled involuntary.  For example, in *United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991), the Court held that the government had failed to establish a voluntary, knowing and intelligent waiver where the defendant had been read his *Miranda* rights in Spanish, and stated that he understood those rights, and signed a written waiver, but defendant's unrebutted testimony established that he had been born in Cuba, had a fifth-grade education, did not speak English or read Spanish, that he barely read the waiver of rights form, that he understood the form "more or less," and that he signed the form only after the agents told him that it would not hurt him.  In reaching this result, the Court emphasized, "It appears that by telling [the defendant] that signing the waiver would not hurt him the agents contradicted the *Miranda* warnings that a defendant's statements can be used against the defendant in court, thereby misleading [the defendant]

20

concerning the consequences of relinquishing his right to remain silent."  921 F.2d at 1435.

However, the Eleventh Circuit has expressly recognized that accurate statements by law enforcement officials regarding the potential benefits of cooperation and potential penalties for the offense on which the defendant has been arrested may be made in the context of a defendant's decision whether to waive his right to counsel and to remain silent, and that those statements will not necessarily render the waiver of rights and subsequent confession involuntary.  In *United States v. Quinn*, 123 F.3d 1415, 1423-24 (11th Cir. 1997), the Court rejected the defendant's contention that the law enforcement officer "made improper inducements and threats to him and discouraged his obtaining an attorney," by telling him that "he was facing a 40-year sentence but might receive a more favorable sentence if he cooperated . . . [and] it would be difficult to cooperate once an attorney had been appointed."  The government argued that the discussion regarding the defendant's choice to obtain counsel was only advice regarding the consequences that could flow from delaying an attempt at cooperation. On these facts, the Eleventh Circuit agreed with the District Court that the defendant's statement was made knowingly and voluntarily.  In reaching this result, the Eleventh Circuit noted that discussions of realistic penalties are normally insufficient to preclude free choice, and render a statement involuntary.  With respect to the determination of the effect of the discussion regarding counsel, however, the precedential value of the decision is limited, since the Eleventh Circuit specifically noted, "We observe, in any event, that [the defendant] made no inculpatory statements after [the agent's] statement about obtaining counsel."  123 F.3d at 1424.

In other cases, the Eleventh Circuit has explored the contours of what is generally

permissible police practice.  In *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994), *quoting United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992), the Court gave the following guidance in evaluating whether a confession was the product of the accused's "free and rational choice" and thus voluntary:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.  Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Accord United States v. Mercer,* 541 F.3d 1070, 1075-76 (11th Cir. 2008) (waiver voluntary where agent testified that '[Defendant] wanted to see me and I went down to talk to him about what he possibly could do to help himself out in his situation," since "approach[ing] Defendant about the possibility of a cooperation agreement . . . alone does not make Defendant's statements involuntary."); *United States v. Nash*, 910 F.2d 749, 752 (11th Cir. 1990) (although the agent told the defendant "that cooperating defendants generally 'fared better time-wise,' this statement did not amount to an illegal inducement: 'telling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government.'"); *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary.").

Therefore, where the defendant has been accurately advised of the required

*Miranda* warnings, in the absence of other coercive factors, the fact that an accused is accurately advised of the advantages of cooperation, and encouraged to do so, does not per se render a waiver of rights or subsequent statement involuntary.  Of course, the totality of the circumstances must be evaluated to make the ultimate determination of coercive effect and voluntariness.

      Once a defendant has invoked his right to remain silent or right to counsel, the invocation must be scrupulously honored.  However, in order to invoke these rights, the request must be unambiguous.  *Davis v. United States*, 512 U.S. 452 (1994); *United States v. Mikell*, 102 F.3d 470, 476-77 (11th Cir. 1996)*; Coleman v.  Singletary*, 30 F.3d 1420, 1423-25 (11th Cir. 1994).  For example, the mere refusal to sign a waiver form does not mandate a finding that the defendant refused to waive his rights.  *See United States v. Acosta*, 363 F.3d at 1153-54*; accord Mincey v. Head*, 206 F.3d 1106, 1131-32 (11th Cir. 2000), *citing United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987) ("Courts have for some time rejected the argument that a refusal to sign a waiver form automatically renders subsequent questioning improper.").  In addition, mere silence is not an unequivocal or unambiguous invocation of the right to remain silent.  *See, e.g.*, *United States v. Ramsey*, 992 F.2d 301, 305 (11th Cir. 1993) (in pre-*Davis* case that applied the now rejected "clarification-only" rule, the court determined that defendant had "equivocally invoked his right to remain silent by looking at [the agent] and then looking away when she initially asked him if he wanted to make a statement")[6]; *Jacobs v. Singletary*, 952 F.2d 1282, 1292 (11th Cir. 1992) (pre-*Davis* case in which defendant's

---

[6]  Prior to *Davis*, if a suspect made an equivocal request for counsel or to remain silent, law enforcement officers were only permitted to ask clarifying questions regarding whether the suspect really wants to waive his rights.

refusal to speak, "even to the point of not giving her name," was an "equivocal or ambiguous indication that she wished to remain silent.").

Finally, even where an accused has invoked his right to remain silent, there is no *per se* prohibition against resuming interrogation at a later time. In *Michigan v. Mosely*, 423 U.S. 96 (1975), the Supreme Court clarified the circumstances under which questioning could resume after the invocation of the right to remain silent. In *Mosely*, the Court held that as long as interrogation immediately ceased upon the invocation of the defendant's right to remain silent, it was permissible for a different police officer to approach the defendant after the passage of a significant period of time (over two hours) for the purpose of interviewing him about an unrelated crime, re-advise the defendant of his rights, and following the waiver of rights, conduct a second interrogation which was limited to a crime that was not the subject of the earlier interrogation. In reaching this result and rejecting a *per se* proscription against further interrogation, the Court emphasized, "To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purpose of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Id.* at 102. Thus, the Court concluded "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 103.

Thus, the determination of  whether the defendant's right to cut off questioning was scrupulously honored requires a case-by-case analysis.  *United States v. Hernandez*, 574 F.2d 1362, 1369 (5th Cir. 1978).  When a suspect asserts his right to remain silent, "the interrogation must cease."  *Jacobs v. Singletary*, 952 F.2d at 1291, *quoting Lightbourne v. Dugger*, 829 F.2d 1012, 1018 (11th Cir. 1987).  Although, as the Supreme Court held in *Mosely*, police may renew questioning of the suspect after a significant period of time has passed, twenty minutes has been held an insufficient period of time between two rounds of interrogation, even where the defendant was re-advised of her *Miranda* rights before the questioning resumed.  *Jacobs*, 952 F.2d at 1293.  Longer periods of time have been held sufficient.  *See, e.g. United States v. Nash*, 910 F.2d at 752-53 (holding post-invocation statements admissible where an hour had passed, the suspect had been re-read his rights, and evidence of who re-initiated discussions was disputed); *Jackson v. Dugger*, 837 F.2d 1469, 1472 (11th Cir. 1988) (holding a six-hour period of non-interrogation sufficient and noting that repeated reading of the Miranda warnings was not coercive).

In addition, impermissible interrogation includes not only express questioning, but also "words or actions by the police "'that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Ramsey*, 992 F.2d at 305, *quoting Rhode Island v. Innis*, 446 U.S. 291, 301 (1980);  *Christopher v. Florida*, 824 F.2d 836, 845 (11th Cir. 1987).  Moreover, although if a suspect "initiates" further conversation there is no violation of *Miranda*, the Eleventh Circuit has emphasized that "initiation" requires that the suspect start the interrogation, not merely continue an on-going interrogation by asking a question.  Specifically, in *Christopher,* the Court gave the following guidance:

> Although the police may terminate an interrogation without falling into total silence, any discussion with the suspect other than that "relating to routine incidents of the custodial relationship" must be considered a continuation of the interrogation.  *See [Oregon v.] Bradshaw*, 462 U.S. at 1045. Specifically, the police may make routine inquires of a suspect after he requests that they terminate questioning, such as whether he would like a drink of water. *See id.*  They may not ask questions or make statements which "open up a more generalized discussion relating directly or indirectly to the investigation," as this constitutes interrogation. *Id.; Johnson,* 812 F.2d at 313; *see Rhode Island v. Innis*, 446 U.S. 291 (1980).

*Christopher*, 824 F.2d at 845.

Thus, where a defendant invokes his right to remain silent, the police are not permitted to engage in further conversation regarding criminal activity unless there is a significant break in time.  If they do so, any statements that the defendant makes must be suppressed.

### 2.  Conclusions of Law

Based upon the totality of the circumstances, and applying the above principles, the undersigned concludes that the Defendant was properly advised of his *Miranda* rights, and that he knowingly and voluntarily waived those rights, and that the statements he subsequently made were voluntary.

At the outset, the undersigned finds that, although it is a close question, the Defendant understood his rights when he was initially advised of those rights in English. A review of the brief recorded statements made by the Defendant during the course of his conversation with co-defendant Williams reveals that he speaks English fluently. Although the record does not reflect the Defendant's education or intelligence, based upon his conduct during the investigation, the Defendant does not appear to have any impairments.  After he was advised of his rights, he was non-responsive, which, as in

*Jacobs* and *Ramsey*, is an ambiguous assertion of his rights–either he wanted to think about it before doing or saying anything, or he did not want to speak to the agents. Moreover, as in *Mincey* and *Boon San Chong*, the fact that the Defendant remained silent after he refused to sign the waiver form, does not constitute an invocation of his *Miranda* rights.  Thus, the agents were not required to cease all questioning.  Thus, it was not improper for Agent Ruiz to encourage the Defendant to talk to them by indicating that he might help himself by doing so, and that if he wanted to say something the time to do it was then.  The agents made no express threats or any promises to the Defendant.

Finally, the Defendant was left alone for over two hours before he initiated further conversation with the agents by stating that he was scared.  At that time, it was permissible for Agent Lopez to determine why he was scared.  Moreover, the agents then re-advised the Defendant of his rights before he made any further statements.  Under *Mosely* and its progeny, even if the Defendant had initially invoked his right to remain silent through his non-responsiveness, under the totality of the circumstances there was a sufficient break in time to permit the agents to resume questioning.  In this case, the Defendant did not assert his right to remain silent, and the brief comments made by the agents following the Defendant's non-responsive behavior do not constitute impermissible coercion.  At this point, the Defendant expressly acknowledged that he understood his rights and initialed each right to signify his understanding.  In addition, he signed the Waiver, acknowledging that he understood his rights.  The Defendant's decision to waive his rights was not prompted by any threats or promises, and was freely and voluntarily made.  Moreover, the Defendant did not invoke his rights at any time during the brief 30-minute interrogation that followed.

Thus, the undersigned concludes that prior to the time that the Defendant was

27

questioned, he was properly advised of his *Miranda* rights, he understood those rights and voluntarily waived them, and that the statements he made subsequently were voluntarily made.

### VI.    CONCLUSION

In sum, the undersigned finds and concludes that the agents had probable cause to arrest the Defendant for conspiracy to possess with intent to distribute cocaine; and that the post-arrest statements made by the Defendant were voluntary statements made after a knowing, intelligent and voluntary valid waiver of his *Miranda* rights.

Therefore, based upon the foregoing analysis, it is hereby

**RECOMMENDED** that Defendant Morante-Palacios' Motion to Suppress Evidence and All Post-Arrest Statements (DE # 33), be **DENIED**.

The parties will have fourteen calendar days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND SUBMITTED** in chambers in Miami, Florida, on March 15, 2010.

ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

Copies furnished via CM/ECF to:
The Honorable Ursula Ungaro, United States District Judge
All counsel of record

28